All right, Mr. Schaffer. Let us have both barrels. I just said let us have both barrels. Got lots going on in this case. All right. May it please the Court, my name is Brian Schaffer. I am appearing here pro bono on behalf of Petitioner Nadeem Ali. We briefed three issues on appeal, Your Honors. With the Court's permission, we would like to focus mainly on two issues. The issues being, first, the statutory language in INA 208, prohibiting the removal of an alien granted asylum. And the second issue is on the collateral estoppelant issue, preclusion issue, is what we would like to focus on mostly. There is no question as to one fact, or a couple facts. In 1992, Nadeem Ali was granted asylum by an immigration judge. Part of that decision found that he had suffered past persecution and he had a well-founded fear of future persecution. That decision was made in 1992. I think we know the chronology. I'm just looking at your clock because I've got a lot of questions. I'll start with this. The plain language of INA 208C is clear. The language says, in the case of an alien granted asylum under subsection B, the Attorney General shall not remove or return an alien to aliens' country of nationality. C1 says that. C2 goes on through termination. And C3 says that an alien who has had his asylum status terminated is subject to removability. That's the language in the statute. There's no language in there that says anything related to how long that lasts. But the regulations in the cases have always interpreted granted asylum to be an indefinite grant. That's from the regulations. In ATFR 1208.22, an alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated. Then 1208.14E says if an— What's my dilemma is you have 208, and you pointed out there's been very little discussion of that by opposing counsel and by BIA below. But you also have 1227. Any alien is deportable with the appropriate controlled substance violation and conviction. So why isn't there a clash there? Any alien is deportable. And then your point would be but not if you're an alien with asylum status? Granted asylum. That would be the prohibition. But 1227 doesn't do a carve-out. It doesn't do a carve-out, but in realms of the asylum statute, for instance, there's a list of reasons, bars to asylum, so to speak. A controlled substance violation is not a bar to asylum. An alien who has a controlled substance violation can be granted asylum. There's no bar to that. And so my argument would be that because of that language, an alien granted asylum is treated differently. Any alien, yes, is subject to removability, but 208 specifically says any alien granted asylum shall not be removed. Okay. Am I correct, though, basically the amici in your arguments were exactly the ones made to the Third Circuit after, and I can't pronounce it, S-M-R-I-K-O's from RICO? That's actually different, Your Honor. The difference between those two cases, and as I tried to outline, the cases, all the previous cases that have come up to circuits and everything has dealt with refugees. Right. But am I right that there's a consensus? Every circuit that has looked at S-M-R-I-K-O has said that that's correct, that the LPR status adjustment terminates your refugee status. Actually, I don't think the language there, and the Fifth Circuit acknowledged that. In an unpublished case, Wynn v. Holder, acknowledging refugee status is not necessarily terminated upon adjustment for a refugee. The issue there is whether a refugee can be removed. A refugee has no bar to removal. It's a conditional admission. As I outlined in the brief, a refugee is admitted through their refugee resettlement process. At one year, they're required to report to immigration for, essentially— But what BIA has basically done is said, we interpret that same mechanism, reasoning, to apply here. And then my brain thinks, okay, well, then they get deference. That's logical. Five circuits have all followed it. I think, is it the Fifth—no, it's the Sixth Circuit in Smolja that applied it to the asylee's circumstances. So why wouldn't we give them deference to say, well, the same thing is working. In fact, maybe stronger in this case because Mr. Ali had to request the LPR status with all the benefits that it gets, the protection from sudden return if there's no more fear of prosecution. He gets a lot when he elected to take LPR status. But in that context, therefore, he's surrendering his asylum. That's their logic, and it seems rational. Why wouldn't we defer to it? For the deference question in terms of—I think that gets down to whether the language of 1208, whether it's clear or ambiguous. I don't believe it's ambiguous, the language. I think people have just failed to acknowledge the language of 1208. But I guess what the logic is here, when Ali requests LPR, the AG isn't terminating his asylum status. He's requesting a, quote, adjustment, an alteration. And then I think your answer is, well, that actually what's happening is he's now getting both. That's our— What circuit anywhere has accepted this phrase layered status or adjusted asylee status? Has any circuit embraced that? The court has addressed this question, and I apologize. This came up in preparation. I didn't brief the issue. But a similar issue that would come up would be a context of a denaturalized U.S. citizen. In those cases, when a denaturalized U.S. citizen is denaturalized, they revert back to an LPR and then have to be put through removal proceedings. Right. So in a sense, they have almost a layering of status in that case, where they have an indefinite status. An LPR status is indefinite. And becoming a citizen doesn't end that status. And then when they're denaturalized, they're put into removal proceedings. And then— What's the best case that even explains that? An old BIA case explains it best, and that would be a matter of Villalma-Ortiz, which is a 1965 case, and that's 11 INM Decision 414. In that case, it dealt with essentially a dual citizen, a citizen of Mexico and the United States. Under the time when a citizen of the United States, if they voted in a foreign election, their citizen— I'll look at it. That's good. Let me just jump to a few other questions. Separately, in this—the facts of this particular case, sort of oddly, in September of 2013, he actually does have an asylum hearing again. Yes. Now, in your brief, you said he was forced into that. Am I right that the record doesn't bear out that he was forced? Essentially, and he's pro se, and from dealing with a lot of pro se, I can tell you a lot of it occurs off the record. And essentially, it's do you want to avoid deportation? Here's how you avoid deportation. Turn it over. So it's basically a—if you want to take a deportation order, we can give you a deportation order quick and essentially— But I guess I don't see— But that's the only way that— So why wouldn't—why isn't that September 23 the functional equivalent of asylum being terminated? As I take it, what the court concludes, if you put aside the credibility and the collateral estoppel argument, you just look at the district court made the alternate finding that your party, what's it called, the PPP, is now the one in power. And lo and behold, you've traveled back there twice. So we don't find a fear of prosecution anymore. That's the functional equivalent of a termination. You could say it's a functional equivalent, but we would come with that would be the issue of where the burden lies. On a termination, the burden would lie on the government, and it would be the government's burden to prove these things. Right. So let's say you win with us. Is there anything stopping the AG from turning around and terminating under 208?  And in your experience, would exactly those findings—alien has been gone back twice, no problem, could live outside of Karachi, his political party now runs the show—wouldn't that be almost conclusive? It—not—I would say just in my experience— Yeah. Those facts probably wouldn't go for asylum. The issue that comes up most often is the travel back to your country. That would be a problem. That would be the problem. Now, I mean, and the record bears this out, but when he—I mean, he testified to that during the hearing, but that was also in the context of reapplying for asylum. Yeah. Now— You don't know of any case law that says that if you affirmatively seek LPR or if you affirmatively reapply, you have therefore surrendered your asylum status? I don't know of any. There's no relinquishment— There's none of that. Okay. The—I find it to be—back to your example of—I find it to be troubling to think that an alien who has protection from being removed to his home country would be faced with this Sophie's Choice sort of thing of, do I become an LPR or do I keep my protection? Okay, but I sort of have a problem the other way because do you—I mean, asylees want LPR status, right? Because if they don't get it, as soon as their country gets safe, everyone thinks you're being repatriated. That's the world of refugees and asylees. The whole point is to get them back to where they want to be. But that leaves a sort of Damocles over their head. This guy totally integrates into the United States. He's here for decades. The one thing he doesn't want is exactly what happened. Pakistan becomes his party. So he wants the LPR status because he can't be sent back that way. The government can't terminate him. He's in LPR protected status. Then he makes the mistake of dealing in drugs, and now he's deportable so he wants back the old status. To answer your question, and this comes up with the—when I cite the USCIS policy memo because there's not a lot of case law that addresses this, an alien who adjusts to LPR status and then travels back, in your example, still could have his asylum status terminated and then would lose his LPR status. Okay. That's how the policy— Do you know of—why would the government seek to terminate asylum status if the guy's got an LPR? There are cases of that. There are cases that it doesn't occur in removal proceedings. It more often occurs before USCIS, the asylum office. I mean, we see it very often. What's the best circuit case? Because that almost implicitly validates your layered status argument. There really isn't. Okay. What happens in this, to make it further confusing for you, what happens in this is who can terminate asylum depends on who grants asylum based on the regulations. This gets to the KA case. I think it's cited briefly. If DHS grants asylum, they're the only ones who can terminate it. If the immigration judge grants asylum, only the immigration judge can terminate it. So when DHS grants asylum— As a matter of law, both are the attorney general, correct? Yes, because of the Homeland Security Act. When it is granted by DHS and it's terminated, there's no essential—there's no judicial review of that. So there's not going to be a line of cases and circuits and that sort of thing. What would happen in that case is they would refer the person to removal proceedings, and then they get to apply for asylum de novo in front of the immigration judge. That's important to me. Is that the 1231 catch-all provision? That the U.S. government can never deport anyone, even if they're utterly deportable, if they have a fear of persecution, correct? That's 1231. Yes. So why—I'm very sensitive to the amici concerns, that we don't want to create a rule that allows any government to sort of come up with a small charge, conviction, and then we've got the refugees out of the country. That's a bad rule for us to announce. But at the same time, if any alien ever has the final protection of 1231, why are we that concerned? 1231 is slightly different because that's withholding of removal, and that's a mandatory grant as opposed to asylum, which is 1158, which has to do with it's a discretionary difference. So in this case, he hasn't been granted withholding of removal, and so there's not a— He hasn't been granted withholding of removal. He forfeited because of his convictions. No, it's a different status. It's a completely different status. So it would be—it's essentially, to lay out how the asylum process works, is my example of a controlled substance is not a bar to asylum. An aggravated felony would be a bar to asylum, but he would still be eligible for withholding. And so that language, while it's incorporated by reference, but it's kind of two different statuses. The—let's see, I'm running out of time. Let me get to the collateral. So most of these asylum cases we see, you know, where it's grant, of course, as you well know, more of them are denied than they are granted. At a very high rate, yes. So, you know, when you get into this narrower universe of a grant, I mean, that's a whole different universe. So—but the nature of this asylum grant is that either the person's fear of persecution or there was torture, etc., etc. It's a discretionary grant. So somewhat inherent in the concept is that it's arguably a transitory situation as opposed to permanent. Here, for example, where the country conditions have changed or otherwise it abates. So the notion of it being, like, quote, permanent is a little bit inconsistent with the nature of sort of what it is. In other words, as you say, who grants it could terminate it if it's changed circumstances, etc. So the notion, though, of having a dual—I mean, it's like the notion of being an immigrant and being a U.S. citizen. You know, in some ways, conceptually, it's like they're mutually exclusive. You either are a citizen or you're not. So the notion of being an asylee yet also having LPR, I just haven't seen any cases which say that an asylee, in effect, gets greater protection, if you will, from dual status than anybody else who's in sort of that pipeline. You see what I'm saying? I do, and I see I'm out of time. Oh, you can answer the question. There's two issues there, I think, that come up. First, the regulations clearly say it's indefinite. It's spelled out there. It's indefinite. Well, it says indefinite, but we know by definition it can be terminated. Right, but that's what I would say. That's what I'm saying. Right, it's indefinite, but inherent in the notion that it can be terminated, indefinite doesn't mean permanent, forever, et cetera. And our position would be a remand with the instructions, and this is what we argued the first time before the BIA, to address termination is essentially all we're looking for, is put the burden on the government to terminate. You want to get right back to where the BIA originally was. That's our goal. Well, that's what I was about to ask you. Down below the clouds. Yes, sir. Down below the clouds here, you know, what is the relief that you seek? You know, the government's here saying they filed a supplemental brief saying, well, we don't have any jurisdiction to do anything, but, and I guess they're going to come up here and say that, and I was going to ask you to comment on that, but what is the ultimate relief? You do a lot of these. So what's your client's status, and what is the relief you want from us? Essentially, we want a remand back to the BIA, which would essentially be a remand back to the IJ to address termination. On the basis of what? What's the thrust? On the basis that the status is indefinite, and the statute requires termination before the status is terminated, and that essentially he needs a termination hearing. But would you concede the IJ could terminate himself? Oh, yes. So it wouldn't have to be at the government's initiative. Okay, do it all the time. But why isn't that exactly what he did in September? Because it wasn't, the government, he didn't put the burden on the government. I know, but you just said he could do it on a remand. You don't. He could put the burden on the government and have a hearing to determine if termination. But there was a hearing, and he found in favor of the government. But he found that the hearing that he had was to determine whether the client was eligible for asylum, and essentially a new application was what the government has argued. And I would argue, and again, I'm sorry I'm over time, but I would argue that at the point of, termination is a threshold issue, and that comes up in the VX case, I believe. After termination, then my client could apply for asylum, and the judge would have a hearing on the new asylum application under the facts. But VX wasn't an LPR case. It was not. It was a situation where he had never adjusted. All right, I'm going to ask the government when it comes up, and I'll ask you now. What do you understand the government's objection to what you're asking for, going back for the termination? Honestly, they've never really addressed it. Well, they're about to. They've never addressed it, so I have no idea. All right, I just wanted to ask you straight up on this one, so you'll get to come back upon rebuttal. Thank you. Appreciate it. All right. We're here for the government. Among all the many things that you talk about, you can embrace that question. You ought to do it now, but at some point, before you sit down, I want to know clearly, is this an academic, esoteric exercise of us wading through the real ID, ARERA, and all the rest, or down to the crunches? You've come from Washington to argue this case, as opposed to the U.S. Attorney's Office, so surely there's a message here of sorts that you want us to get. Is that accurate? First, good morning, Your Honor. May it please the Court. Ben Zaylin on behalf of the Attorney General. Come on, you've got to have your theater voice for this case. I mean, there's no mumbling here. We've got to hear every word you're saying. There's no message being sent by coming from Washington. The Office of Immigration and Litigation handles almost all exclusively immigration cases nationwide. All right, well, while I've got the mic here, why don't you take on just that straight-edge question. I mean, isn't there a narrow ground here, you know, for resolution? He says he wants to go back for the termination, for a new termination hearing. What's the government's, without conceding or waiving, you know, any policy issues, I mean, but cut to the crunches, what's the objection to that? The objection would be that Petitioner Mr. Ali was not in 208 status. So essentially the government would be bringing termination proceedings against an LPR, which there's no statutory mechanism to do at all. Petitioner, after being granted, as you know, the facts of the case from reading the briefs and the record, after being granted asylum in 1992, Petitioner affirmatively adjusted his status through INA Section 209. What percent of asylees do that? Huge numbers, right? I obviously don't know. Because they get substantial protection and benefits. That's exactly right. Okay, my question then on that is, do you tell them when they do that adjustment and request it, do you say to them, and by the way, you've given up asylum because we construe this to be, it's not Peter Pan, one thing and the other. You're losing it. Does the government ever tell them that they're surrendering the asylum protection? To be frank, I'm not sure if the government does that. But why? That seems enormous. Why? If the government thinks there's the magic moment, and now they've lost asylum protection, if they commit any CSA violation, just a drug violation, I mean, they're not good things, but other than marijuana, anything counts. And you're saying neither this record nor your knowledge as OIL is you tell these pro se aliens that it looks really attractive to be in LPR, and every refugee is going to be forced to be in LPR, but you're losing a huge protection. You don't tell them that? Well, not forced.  That's correct, Your Honor. And the logic of BIA, to the extent that there's any logic in their reasoning, is to embrace SMERCO and say, well, we did it for refugees, so we should do it for asylees. That's what they've done. Well, I think it's important because under 208, the status is temporary. I mean, it exists, but it could always be terminated. There's always the opportunity because it's not protection, as counsel stated. It's actually a relief from removal. So it's not protection under the CAT or, as you mentioned, withholding. That's sort of a mandatory. You cannot return the individual back to the country. Here, asylum, you know, the status can vanquish through termination proceedings. So an individual who has been granted asylum status would want this extra layer of protection, which is LPR status, which is then a path to United States citizenship. So when you say, why do people give it up? Once you become a United States citizen, then you're not any alien. But what Yaniki points out, of course, I mean, 208 says it itself. If you get nationality status, then of course you're safe again. But this guy was in LPR status for decades. It's really hard to get nationality. So the government's positioning is that, as you said, it's an implicit vanquishing, or the treaty words, it's cessation, where our 208 statute, it's terminated. But they're never told that happens? You know, I can look into that. I'm not sure if that's on the application for adjustment. But I would, as you mentioned earlier, I mean— Not only that, but the regulation, 1208.14G, allows asylum applicants to continue applying for asylum even after they've acquired LPR status. Where does that fit into this? Well, I'm not sure that's specifically part of this case. It isn't a part of this case, but it floats out there and, you know— Right, because if that's true— It is true. It's the specific language of the regulation. Layered status is reality. I mean, I may be really dumb about this stuff, and practitioners know it, but if that—I hadn't studied that. But therefore, you've got layered status. Well, I mean, the government would say that there's not layered status, and I would have to look more into that statute. I'm not— Regulation. Regulation. When you say there's not layered status, what's your best case to say? Not refugee context. Well, I mean, the board would expressly say that in the matter of CJH. Article III court case. That's correct, Your Honor. I mean, but the agency that is required in the first instance to analyze the statutes which it administers. But refugees, I can see more logic, because by operation of law, they're altered and adjusted. I suppose what SMERCO must contemplate is, therefore, that is a termination by the government. But it's a leap to apply it to asylees who voluntarily accept this. When you say voluntarily accept adjustment of status? Yeah, they voluntarily seek it, and they're not told when they do it that they've lost— Because it is an added benefit, much greater than that of asylum. I mean, one, as we discussed, it's a path to citizenship. It allows for family members to come to the United States. It allows, obviously, for work authorization. It allows for public benefits. There are a number of reasons why one would seek to adjust status. I mean, while one may stay in asylee status in perpetuity, that status obviously terminates once an individual adjusts their status to a lawful— See, that's the whole issue for us. You can't win it by saying obviously. Yeah, that's exactly—he's exactly right. You can't just declare it to be so. And I might add, fairly recently. I mean, all of a sudden, from nowhere, this decision comes down. There we are. And then, unfortunately, it doesn't go up on appeal, so we don't have any circuit precedent anywhere. That's correct, Your Honor. But the board, when this question was presented, in a slightly different context, in a readjustment context, and some of the other circuits have said that asylee status terminates. Well, one, right? The Sixth Circuit? And I believe— How do you pronounce it? I'm not sure exactly. Molagi? Molagi. That's your best case? Well, the Ninth Circuit has also similarly said, in Robledo Pastora, similar, that an asylee who acquired LPR status is no longer an asylee. So you're saying that if we rule in his favor, we've created a split, or is it not that clear? Well, some of those cases come up in the readjustment context, but I would say it's a split because you would essentially be saying that an individual who's an LPR is also an asylee, right? So you would be having a dual benefit that nobody else would have. You would be both an asylee and an LPR. We know the consensus of circuit law is that you don't have that for refugees. So this case reduces a little bit to, is there legal significance in the context of 208, 209, to the refugee-asylee distinction? Correct. Did the BIA explore that at all in CHJH? I don't think they did. Well, the board in CHJH did not specifically touch on that. But that's pretty vital. Well, I would say that it's vital in terms of when you look specifically at this case because this case looks at whether or not he can revert back to asylee status. Yeah. So it's implicit in the argument that he reverts back, that he was no longer an asylee, and I guess Your Honor had mentioned he kind of maintains this dual status. But what Petitioner's arguing is that he reverts back, right? So he's not— No, they're saying he never lost it. You didn't terminate it. And it is true, the government brief and the BIA, no one ever—they don't want to discuss and help us out with 1158. They just constantly say that's not the situation. But if you look at it, that's based on extraordinary treaty coherence, change circumstances mean government can terminate. We don't have the U.S. government ever terminating this guy. We've got him asking for a special U.S. legal status in between, LPR. Then we have the BIA with no reasoning saying, and the consequence of that, which I presume we never told them, I think you'd know if we did, is you've lost protection that you once had. And we have this regulation that I've just read you, which has been in the briefs. I mean, you say you're not familiar with it, but it didn't spring fully born into my head. I got it from the briefs. I mean— Well, certainly, Your Honor, I would suggest that the reason the board didn't discuss 208 was because he was in 209 status. And I know I'm sort of harping on that, but it would almost seem that the DHS would be sort of overstepping its bounds if they brought termination proceedings because he could then argue, well, I'm not an asylee anymore. But I thought Opposing Counsel said that happens quite often. People who are LPR status, the government pursues them to knock out their asylum status because they've changed circumstances at home. Well, I'm not aware of that, Your Honor. I mean, I know that the government would be able to bring termination proceedings. I mean, I think, you know, one point is, you know, in this case, you can say it would be futile to bring a termination proceeding. Because of BIA's little shift. But the reason the BIA remanded in the first place was they knew at that point the law required that. Well, I think that BIA, when Matter VX was the guiding decision, saw that there was some, that in this sort of tricky situation where it's a little bit different than most common asylum claims we see, that there may be termination proceedings were necessary. But after CGH was sent back to the Immigration Judge who then analyzed CGH, I think the Board rectified that sort of tension, that once you are a lawful permanent resident, termination proceedings would really, there would be no authority for termination proceedings. I mean, again, you know, it seems. So what's the protection for the parade of horrible situation, which is a gentleman like Ali, instead of Pakistan, Syria, and he commits a drug offense, cocaine possession, and yet we know he'll get beheaded if he goes back. But he's deportable. And there's the fear of prosecution totally continues to exist. What's the protection for him? Because you're saying he's lost? He then has to reapply? Well, I think, well, first, again, as I said, asylum is discretionary relief, administrative grace by the Attorney General, different than Convention Against Torture Protection, which is. . . Okay, well, just assume fear of persecution. Assume we're in an asylum world. How is he protected from. . . Well, I'm just trying to clarify, in this specific case, or, you know, if it's sort of an aggravated felony case where you're barred from seeking asylum, you are able to meet withholding of removal, which would be a higher burden, 1231, or you can meet Convention Against Torture, which is, you know, obviously a different burden. But there are protections for individuals that have their status, you know, if they're LPR. And as you mentioned earlier, I mean, 1237 covers any alien. So, you know, LPR or asylum status or refugee status, you still have the ability to terminate, you know, to remove these or deport these individuals. So, but there are grounds of protection which are mandatory, which the Attorney General, the immigration judge, must grant if there's a, you know, risk of, you know, 90% chance of, you know, withholding of removal, you know, a higher burden or Convention Against Torture protection. So there are protections. I mean, it's not. . . Why wouldn't, in this case, you want. . . First question that you were asked, why wouldn't you just want to get back down to the IJ to assess a situation that looks like almost for sure the government's going to win if he's travelling back and forth to Pakistan and his party's in power? That seems like a really easy little step that doesn't force us to make a sweeping ruling as to all asylees in America. Or, second option I would think that you would want to argue is that the September 13 hearing was, what I said, a functional equivalent of a 208 termination. That's not a . . . neither of those are options? Well, I think I tried to articulate that earlier in saying it would be futile for that because, in essence . . . But do you have any authority that allows . . . that stands for harmlessness in this context, futility? I don't have any specific authority on that. I mean, I . . . what the government's position would be. Because it wasn't a . . . as counsel earlier mentioned, it wasn't a specific 208C hearing, you know, with termination and with burden shifting. Yeah. But, in essence, the decision would be the same based on the fact that . . . and there are many grounds you could charge someone with . . . you know, for termination, but essentially the ground that he had returned on multiple occasions to Pakistan. He had lived in Pakistan and country conditions had changed. That would certainly be a grounds for termination. So, which sort of evokes why that would be a futile process. No way the government sees value to remand so the BIA can articulate the connective tissue between SMERCO and refugee world and asylee world? It just seems like . . . it seems in this specific case . . . and I know there may be some tension with the regulations, but . . . it defeats the purpose of lawful permanent resident status if one is going to be able to adjust status. And then, in perpetuity, unless termination proceedings are brought, maintain the sort of dual status. There is something given up by not being an asylee, but . . . You're saying that, but the trouble is we're trying to say, where is that enshrined? I mean, you just said it, but where is that notion enshrined in terms of Attorney General's policy manual, regulation, or something? You said there's no circuit case. I mean, it's one thing for you to say it, and we hear it, but it's another matter that that doesn't seem to be enshrined anywhere. And then, when looking where there seems to be tension between you saying there's no dual-layered status and then words would seem to say something different. So, if that's such an overarching guiding principle, why is it not enshrined somewhere, even if we had to give deference to it? Well, it doesn't come up that often, which I think is why it's not enshrined. But the government would say that it is enshrined in 209. And while 209, then one would say it's silent on it, the board interpreted 209 to say that once an individual adjusts his status, which is an affirmative step by that individual to become a lawful permanent resident, that asylee status terminates. And I think the board in CGH makes that expressly clear, and I would submit that it's a reasonable interpretation of INA 209. You say this doesn't come up very often, but, however, the amici briefs are pretty convincing that lurking behind all of this are treaty provisions and commitments that we've made and we expect other countries to make going back decades. And, you know, everyone, every day we have headlines of political asylees entering into countries. And as I said at the outset, I wouldn't want these treaty provisions that seem virtually verbatim into our law to allow every other country to say, oh, we've caught you with drugs. So now, even though you're a political asylum and there are grave difficulties, your asylum status is gone because you've adopted this intermediate status called LPR in the United States, and by getting the benefits that gives, you've lost the protection that you had. You've lost the protection you've had because of acts that violated the laws of the United States. But those could be very small acts with very huge consequences that were originally validated by the U.S. government. This person had a fear of persecution. We've never had a hearing to say he doesn't. What he's done is he's violated one of our laws. Bad thing to do. But we've never even informed him by accepting the very attractive status. He's lost the most important thing to him, which was not being sent back to a hostile environment. In the criminal context, you've got to tell people what they're relinquishing. Your Honor, I would say that it's pretty plain that when you're applying. But it wasn't even to the BIA when they first remanded. BIA until very recently interpreted it the other way. So you say it's really clear, but they did an about-face in this very case. We saw when it happened. Well, I think because at that time the BIA had not had a precedential decision on this specific. So is your position that every single asylee that was given asylum status before this switch in time has now sort of been put on notice that what may have been true and according to the BIA was their view of the law is now not? Well, I would say the position of the government is that when you are granted discretionary relief in the form of asylum and then you are given that benefit and you seek additional benefits, which is to become a lawful permanent resident, and you are granted that after filing an affirmative application, then that status terminates. You no longer are in asylee status. Well, I guess if I don't answer, I'm not the one to tell you this, but the presiding judge, I would be very interested to know the answer to what you said you don't know the answer, which is are they all told that the LPR that I'm guessing the vast majority apply for, that good status toward citizenship, has an unspoken huge relinquishment. Are they told that? You said you don't know, and that would seem to me very important. Well, I can look into that, Your Honor, and submit a letter brief if that would be of interest to the court. While you're doing that, you can address this regulation that it's referred to in the briefs. 1208.14b. We'll do that, Your Honor. Well, more specifically, Dan, if you're going to file something, then counsel opposite can reply to it. You've argued to us, in effect, that there is no layered or dual status, yet there seem to be some contradictions there. Specifically, the task is to do the homework on the pertinent regulations, policies, et cetera, and to the extent that they do either arguably speak to there being a dual status or reflect on it at all, file that in the form of a letter brief, either in support or opposition to the position taken so we'll be clear about what are all the governing regulations. And you can do that. How much time do you need? Ten days? Fifteen? Either of those dates would be fine. Well, it's holidays. We'll take 15 days to file it because we want something locked down, you know, tight on it. And then when you file it, counsel opposite, you can have seven days to reply if you need to. But mainly, it's not so much argument that we're looking for, but to tie down, you know what, the policy. It may or may not be dispositive in terms of how we resolve the Clay case, but it certainly will be illuminating for us understanding the government's position in this case, on the one hand, to say something does not occur very often, close quote, but on the other hand, to buttress it that this is the government's policy about something which doesn't happen that often. So, you know, you're from the government, and to get your plane tickets' money's worth, you know, we want you to file it because we're zoned in here to correctly decide the case, but there are a lot of moving parts here with these different statutes. Just reading 1208 and the rest of this, it is not self-evident what's going on here. We recognize the Attorney General has a huge amount of discretion here, but it's not. Are you resting on your you filed a late, I say late, a supplemental brief on the jurisdictional point? So are you interposing that as a basis to not do what I just said because we don't have any jurisdiction to do anything? No, Your Honor. The brief was just to advise the court that there is a jurisdictional bar, but the government also conceded that with respect to the questions of law, the court does have jurisdiction to review those raised by the petitioner. All right. Just want to make sure we got you on the tape so we don't have anything waived here. Just wanted to be clear, and as you point out, jurisdiction is always before us, but we want to be real clear about what the position is. All right. Well, we'll appreciate your scholarship as we continue to work on this. Thank you, Your Honor. Thank you, sir. All right. Back to you, Mr. Schaffer. Your Honors, to get back to the layering of rights issue, an asylee that adjusts and becomes a permanent resident, there are certain rights he remains as an asylee. The first major one is because he's an asylee, he has no nation, and he's eligible to apply for an asylum travel document. Other permanent residents are not allowed to apply for a travel document. He's only an asylee. He doesn't keep those travel documents. Yes, he does. Until he becomes a citizen, he continues to reapply for the travel document. And as part of that, and this gets to your warning question, are they warned? They are warned. They're warned exactly what I'm saying. USCIS, on their website, USCIS fact sheet entitled, Traveling Outside the United States as an Asylum Applicant, an Asylee, or a Lawful Permanent Resident who Obtained Such Status Based on Asylum. USCIS sees them as different. What do you mean? Are they warned that they've lost? They're warned not to travel back to their home country because they could risk losing their asylum status. I see what you're saying. See, there's another problem. They're warned exactly what we're saying they're warned. And, again, we see this in practice, not just in here. Another example of— When he goes back twice, he's disregarded that warning, and your view is the government now could terminate it. They could, and the Attorney General has to determine that. So it's a termination hearing. But I bet the government's going to say, we don't have the resources to terminate people that have elected LPR status. We don't even focus on them anymore. They're now on their way to citizens, and we aren't looking at changed government circumstances. We can't spend the time to look at every government. And that would be—I would say that's part of procedural discretion. They can choose who they want to terminate and not terminate. But they still have to do it. Once they catch him with the drugs, you have no problem with them commencing termination as a parallel proceeding? Not as a parallel, as a threshold proceeding. And what I would say in this case, and not to— the issue of him coming back, going back to Pakistan, that came up in his asylum. If the burden's on the government, he can just stay quiet and say, prove I went back to Pakistan. But when he's forced to apply—or when he has to apply for asylum to stay in the country, he has to bring that back as part of his application. So he doesn't—the burden's not really put on the government. Another example of layering of benefits would be they get to file asylum family petitions. An asylee, from the time they get their asylum grant, they have two years to file for an asylum for their families to come to the United States. That's not cut off amongst permanent residents. That is cut off only at two years. It's not cut off at a year when they can become a permanent resident. Government benefits. An asylee is considered a qualified immigrant. They're eligible for all government benefits that a U.S. citizen would be eligible for. Another example that comes up is family adjustments. And I address this in the policy manual. This is a weird situation that happens. But a family member of an asylee is considered a derivative asylee. If the family member, the principal, becomes a permanent resident, the asylee—the derivative can become a permanent resident. But USCIS takes the policy, and it's in their policy manual. If the principal becomes a permanent—becomes a citizen prior to the derivative becoming a permanent resident, the derivative asylum status is cut off because the principal is no longer an alien grant of asylum because he's not an alien, which gets back to the amici's argument about new nationality. That's in the policy manual about how they handle family adjustments. Your view is if we rule in your favor, it's not disruptive because the BIA always assumed exactly this until CJH? That's the way the policy has always been. It's the way it's done in practice. And back to the example of do you adjust or do you not adjust, that's something we've always considered. Like, okay, how does this affect your family? I deal with refugees and asylees all the time. I have to time the naturalization of the parent based on the child. I have to make sure the child gets a permanent residence card before the parent gets it naturalized. And these are all things that are considered when you practice in this area. And so the policy that I'm arguing is basically what the policy has always been. And the last thing I'd like to point out is one thing is this continuously comes up in the readjustment context. And this isn't a readjustment. He was pro se. He never asked for readjustment. He basically just said I'm an asylee. The government continues to quote Roberto. Oh, he did ask for adjustment to LLPR. No, he never did. Not the second time. Oh, not the second time. Without deciding whether and regardless of whether Roberto simultaneously holds up asylee and LPR status, we conclude he's eligible for readjustment. But they even address it. They're not answering this question we're asking you to answer. No one's answered it before in a court. You know, one of the things that strikes me about this whole situation, and this is something that maybe you need to think about, too, and maybe I'm on another planet, okay. But when the BIA comes down with that decision, that's CJ or whatever it is, that is a decision that comes down from on high. And it may or may not fit comfortably with the whole regulatory framework that's sitting underneath it. And that's the problem. That's some of the problem here. The BIA fully, you know, from the head of Zeus comes this decision. And the question is, well, but there's all this regulatory framework under it, and it may not fit with that. And so I think that may be what's happened here. And so the question is, what do you do with that decision? And, of course, it didn't go up, so we got no benefit of a circuit court looking at it. We don't have a lawyer of your caliber looking at it, yours, and yours, too. So there we are. And that's part of the problem here, I think. It may be part of the problem. And that's something that you need to think about. What is there in the regulatory setup and the rules and so on, this lawyer's been so helpful telling us about, it doesn't quite fit with that thing. So. And in that spirit, what would you say if your opponent's answer were simply, there is this, they hadn't thought it all through, but they get deference? I would say there's no deference due because the language of 208, and they didn't get the language. And I would also rely on the Sui versus Holder decision, which dealt with a similar 209 issue. But the BIAs had chance after chance. I mean, they remanded it once to the IJ. We went back. And we argued it here. They haven't responded. So, I mean, I would say they don't have deference because they didn't address the language in 208, and then they just, they reluctantly adjoined. The best case is what? Is the Sui versus Holder decision, which is the Fifth Circuit case from 2014. Okay. SIWE. All right, Mr. Schaefer. Thank you very much, Your Honor. Before you leave the podium, I've got an administrative question for you with my chief judge hat on. I've got a matter on my desk dealing with sort of pro bono counsel in immigration cases. That's sort of in the incubator, you might say. Can you give me a ballpark? I take it you do take a number of the pro bono cases in immigration? You do a fair number of them? I'm actually the director at a nonprofit, and so I not only take the cases pro bono myself on my extra time, but I actually also organize and facilitate pro bono representation in immigration. For the Houston area? In the Houston area, yes. All right. You got a ballpark idea of about how many in a given year or how many lawyers are taking on the pro bono ones? I guess more to the point ones that may end up in our court, so to speak. It's very small as a percentage of cases. I mean, it would be, I would say, less than 1%. The issue really is the backlog. Give me a raw number. I mean, just nothing scientific. I would say in the Houston area, 100, maybe 150 cases total. Okay. That would end up in immigration court. Okay. That's helpful. Like I said, this is kind of an incubator sort of concept, and when I noted you were pro bono, I couldn't resist the temptation to get the information.